### In re ANDERSON.

(District Court, D. South Carolina. August 2, 1900.)

1. BANKRUPTCY—BANKRUPT WITHHOLDING PROPERTY—CONTEMPT—POWER TO PUNISH.

An involuntary bankrupt who withholds property from his trustee in bankruptcy is liable to punishment as for contempt of court, notwithstanding Rev. St. § 990, providing that no person shall be imprisoned for debt in any state, on process issuing from a court of the United States, where by the laws of the state imprisonment for debt has been abolished; but the power of the court to punish in such cases should be cautiously exercised.

**2. SAME—EVIDENCE.**

Where a bankrupt denies the possession or control of property alleged to be withheld by him from his trustee in bankruptcy, his possession of such property must be established by undisputable testimony, to render him liable to punishment for contempt because of such retention.

**3. SAME.**

An apparent deficiency of assets reported by a bankrupt, according to capital invested, goods purchased, and claims proved, will not warrant his punishment as for contempt of court, where his bank account shows that during the period covered by such computation the bankrupt paid within about $700 of the amount of such deficiency upon the debts of a firm of which he was formerly a member, and that the balance not so accounted for may be attributed to the loose manner in which the business was conducted.

**4. SAME—EXEMPTIONS—NOT ALLOWED OUT OF PERSONAL PROPERTY NOT PAID FOR.**

Under Const. S. C. art. 2, § 32, which allows a debtor to hold personal property exempt from attachment to the amount of $500, but provides that no property shall be exempt for payment of obligations contracted for the purchase of such property, a bankrupt is not entitled to such exemption out of the proceeds of a sale by the trustee in bankruptcy of merchandise which has not been paid for.

**5. SAME—HOMESTEAD—PURCHASE MADE WITH PROCEEDS OF MERCHANDISE NOT PAID FOR.**

Under Const. S. C. art. 2, allowing a debtor a homestead in lands to the value of $1,000, which shall be exempt from attachment, except for debts for the purchase price, where it appears that the debtor had at least $1,000 in money when he commenced business, he will be entitled to claim as exempt a homestead subsequently purchased with the proceeds of merchandise not paid for, if at the time of the purchase he had no such contemplation of bankruptcy as would constitute the purchase a fraudulent diversion of moneys properly belonging to his creditors.

**6. SAME—APPRAISEMENT.**

Where the evidence tends to show that the property claimed by a bankrupt as a homestead is worth more than the value allowed by the laws of the state, the same may be appraised, and, if it exceeds the legal value, it will be assigned as a homestead, upon payment to the trustee in bankruptcy of the sum above such value.

**7. SAME—ALLOWANCE TO BANKRUPT'S ATTORNEY.**

Under Bankr. Act 1898, § 64b, providing for the allowance of a reasonable attorney's fee to the bankrupt in involuntary proceedings, where the attorney for the bankrupt is required to prepare schedules of the bankrupt's assets and liabilities, and attend references before the referee in matters involving the conduct of the bankrupt's business prior to his bankruptcy, an allowance to the attorney of a fee of $90 out of the estate in the hands of the trustee is not excessive.

In Bankruptcy.

Willcox & Willcox, for creditors.

W. F. Clayton, for bankrupt.

BRAWLEY, District Judge. The above-named was adjudged a bankrupt in involuntary proceedings November 18, 1899, upon the petition of certain creditors. The same creditors had previously instituted proceedings in attachment in the state court, early in October; and the stock of merchandise was seized in those proceedings, which attachment, however, has been dissolved in the state court. A trustee in bankruptcy was duly appointed, and in due course an accounting was had before the referee, and the bankrupt was examined. As the result of such examination and accounting, the referee, in a careful and

well-considered report, found that the bankrupt had failed to account for the sum of $3,362.17, and that he had that sum in his possession or under his control. This result was reached by charging the bankrupt with $3,700 of assets on hand, in goods and money, at the beginning of the year 1899, and the account of merchandise purchased during the year remaining unpaid, that amounted to $9,881.63. The referee having allowed credit for the stock of goods on hand at invoice prices, and for sundry payments and credits, to the amount of $10,219.46, the balance found due was as above stated. The bankrupt having failed to turn over the above-mentioned sum to his trustee, as directed by the previous order of the court, a motion is now made to commit him to jail as for contempt. It is contended that such order of commitment, being in effect an imprisonment for debt, is forbidden by the constitution of South Carolina, and by section 990 of the Revised Statutes. I give no weight to such contention. Upon an adjudication in bankruptcy, all the property of the bankrupt, of every kind and description whatsoever, falls at once in custodia legis. His estate belongs to the court, and any withholding of the property of the bankrupt by himself or others is in derogation of the rights of the trustee, who is entitled to hold it for distribution among the creditors. An order for the delivery of the property or for the payment of the money belonging to the estate is not in the nature of a judgment or execution for debt; for such money or property belongs to the court, and it is its duty to place it in the hands of the trustee for distribution pursuant to the law. The withholding of such money or property tends to obstruct the administration of justice, and it is a power inherent in all courts to enforce their orders against recusant parties. They could not effectually protect themselves against the assaults of the lawless, or enforce obedience to their orders, without a summary power to commit for contempt; for the power to make an order carries with it an equal power to punish for a disobedience of it. I have not, then, the slightest doubt of the power of the court to commit for contempt in any proper case, but this power should be most cautiously exercised. Where the bankrupt denies possession or control, the fact of such possession should be established by indisputable testimony; for it is only in cases where it is proved beyond a reasonable doubt that the bankrupt is willfully disobedient in refusing to obey its orders that the court should feel itself compelled to punish such disobedience. It follows that it is not sufficient to establish a probability, however strong, that the bankrupt is in the possession of the money, but there must be reasonable and moral certainty, and the circumstances tending to establish it must be such as to clearly exclude any reasonable supposition to the contrary. In a civil action to recover the money, it would suffice if there was a preponderance of the evidence that the bankrupt had it in his possession or under his control; and, though it might not be free from reasonable doubt, if it is more likely to be true than not there could be a judgment against him, and process issued for its recovery. There have been numerous cases under the present law wherein this question has been considered, and the legal principles which should govern have been set forth with sufficient clearness. In re Purvine, 37 C. C. A. 446, 96 Fed. 192; In

re Rosser (C. C. A.) 101 Fed. 562; Knitting Works v. Schreiber (D. C.) 101 Fed. 810; In re Mayer (D. C.) 2 Nat. Bankr. N. 257, 98 Fed. 839; In re Deuell (D. C.) 2 Nat. Bankr. N. 597, 100 Fed. 633. Each case must be determined according to its own facts.

The testimony shows that Anderson conducted a mercantile business at Timmonsville, in connection with his brother, during the year 1898, and that about the end of that year a fire occurred, as a result of which the business was broken up, and that he commenced business on his own account, with a part of the damaged stock, and with some money received as insurance. The amount of this capital is stated as $3,700, but upon the argument before me it was contended that this was an overestimate. No books of account were kept, or at least no books from which the true condition of the business could be ascertained. Such as were kept are of such fragmentary character that it is impossible to ascertain from them any correct, or approximately correct, idea as to the business. It is not alleged that the failure to keep proper books was due to the fraudulent purpose of concealing his true condition, and the testimony tends to show that it was to be attributed, rather, to his inexperience and incapacity. He is a very young man, and had had very little knowledge of business. Upon the report of the referee, it seemed to me incredible that such a large deficit should honestly occur in a business of such small magnitude within such a comparatively brief space of time, and as the referee had evidently considered the case with care and deliberation, and is a lawyer of the highest character and intelligence, I was greatly inclined to accept his report as conclusive; for, having opportunity of seeing the witnesses, which the court had not, his conclusions were justly entitled to great weight. But, inasmuch as the enforcement of any order made by me would involve imprisonment for an indeterminate period, I felt it to be my duty to proceed with caution, and the bankrupt was brought before me. Upon that hearing it transpired that he had had dealings with the Bank of Timmonsville during the year 1899, and it did not appear that his account with that bank had been produced before the referee. Thereupon an order was made for an examination of this account, and I have before me the statement of the cashier, showing the transactions of the bankrupt. I have not the advantage of any comment upon this testimony by the counsel for the creditors, and therefore accept the exhibits as filed by the cashier as true. Exhibit A, which is entitled, "Mr. C. Anderson in Account with the Bank of Timmonsville," shows the debits and credits from January 17, 1899, to October 3, 1899, with one item of $2.32, amount paid to Thompson, trustee, on December 12th. This account shows deposits of $8,629.66, and payments to the same amount. It, therefore, would not affect the figures given or the results reached by the referee. It tends to show that the volume of business transacted during the year was considerably larger than might be inferred from the referee's report. Exhibit B, however, which is entitled, "Memorandum of Cash Received in Payment of Drafts Sent Me for Collection on C. Anderson," shows that the bank paid out during the period beginning February 4th and until September 19th, to the various mercantile establishments whose names are given, the sum of $1,664.92. Exhibit C, which

is entitled, "Memorandum of Cash Received in Payment of Drafts Sent Me for Collection on Anderson Bros.," from January 20, 1899, to September 20, 1899, shows payments of $984.30. I assume that C. Anderson paid out this money on account of the old debts of Anderson Bros., which were assumed by him. The aggregate of these payments is $2,649.92, which, deducted from $3,362.17, the balance found unaccounted for by the referee, would leave only a balance of $712.25. These accounts show that, up to the day the attachment proceedings in the state court were commenced, Anderson was paying out moneys to his creditors as they seemed to fall due. There is testimony showing that certain statements made by the bankrupt to some of the creditors during the year are untrue, and they naturally produce an unfavorable impression; but, as the testimony is clear that the old business was very loosely conducted, it is entirely possible that the balance of $712.25 unaccounted for upon the present showing may be attributed to that cause, and, in the absence of any direct testimony that the bankrupt has this sum or any sum in his possession, I do not feel that certainty that Anderson is now in the possession of the money which he withholds from the creditors which would justify me in committing him to jail for noncompliance with the order to turn it over to the trustee, and such order must for the present be refused. If hereafter the attorneys for the creditors should satisfy me that I am in error in allowing the credits which appear in the statements of the Bank of Timmonsville, or if any new facts have been brought to light since the last hearing which tend to show that the bankrupt is in possession of money, the application for such order may be renewed.

The next question to be considered relates to the claim of the homestead exemption. The trustee has set apart the wearing apparel of the bankrupt in his possession, of the value of $50, and one bicycle, of the value of $25, and allows him out of the cash in hands of trustee (being proceeds of the sales and stock of merchandise in the store in Timmonsville, and sold by the trustee under order of this court) the sum of $425. He also sets apart the dwelling house and lot in the town of Timmonsville, of the value of $1,000.

First, as to the personal exemption: The constitution of South Carolina exempts from attachment, levy, and sale personal property to the value of $500, or so much thereof as the property is worth, if its value is less than $500. So the exemption of the wearing apparel and bicycle, of value $75, is allowed. The amount of $425 of cash from the proceeds of the sales of stock of goods cannot be allowed. The proof shows clearly that these goods had not been paid for. Claims of creditors to the amount of about $10,000 for goods sold have been proved against the bankrupt, and are unpaid. One of the provisos of section 32, art. 2, of the constitution, under which the homestead is claimed, is as follows:

"That no property shall be exempt from attachment, levy or sale for taxes or for payment of obligations contracted for the purchase of such homestead or personal property exemption or the erection or making of improvements or repairs thereon."

The money in the hands of the trustee, being derived from the sale of the merchandise for which the purchase money is still due, is not a proper subject of homestead exemption, and it would be unconscionable to allow it. To this extent the report of the referee confirming the allowance made by the trustee is set aside.

Second, as to the real estate: The constitution allows a homestead in lands to the value of $1,000, with the same proviso above recited; and it is claimed by the creditors that the improvements upon the real estate assigned as homestead were made with money derived from the sales of the merchandise, and therefore it is in the nature of purchase money, and that such exemption should not be allowed. There is some force in this contention, and I have not been able to reach a conclusion with reference to it entirely satisfactory to my mind. This real estate was purchased by the bankrupt in July, and the title was taken in his wife's name. The house was erected subsequent to that date out of moneys received by the bankrupt at his store. Inasmuch as there is proof that the bankrupt at the time when he commenced business, in January, was in possession of funds to the amount of $1,000, at least, and at the time when the lot was purchased, there is not sufficient evidence that he had such contemplation of bankruptcy as would lead to fraudulent diversion of moneys properly belonging to his creditors in the improvement of the homestead. I am inclined to allow this exemption, and do so order. Inasmuch, however, as the proof tends to show that the house and lot exceed $1,000 in value, the case is recommitted to the referee, with directions to have appraisers appointed,—one to be selected by the bankrupt, one by the trustee, and one by himself,—who shall appraise the homestead. If it exceeds in value $1,000, it will be assigned as homestead upon the payment to the trustee of any sum in excess of the amount of $1,000.

The next question relates to the allowance of $90 to W. F. Clayton, Esq., as attorney for the bankrupt, to which allowance the creditors have excepted. Section 64b of the bankrupt act, which provides for the payment of costs in the administration of the bankrupt estate, provides for "one reasonable attorney's fee, for the professional services actually rendered, irrespective of the number of attorneys employed, to the petitioning creditors in involuntary cases, to the bankrupt in involuntary cases while performing the duties herein prescribed." The amount that should be allowed to the attorneys for the bankrupt in involuntary cases should be limited to compensation for such services as are presumptively of benefit to the estate. The bankrupt in such cases is required to prepare schedules, which require the services of a lawyer; and, if he is compelled to attend references before the referee in matters involving the conduct of his business prior to the bankruptcy, he should be allowed services of counsel, to the extent of protecting his rights on the inquiries so made. This is in aid of the proper administration of the estate, and allowances out of the estate should be strictly limited to services so rendered. No allowance should be made for services rendered in defending the bankrupt from charges of fraudulent conduct or concealment of property. I am of opinion that the allowance of $90, under the circumstances, is not excessive, and the report of the referee is therefore confirmed.